# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 01-3888 & 02-1152

PIVOT POINT INTERNATIONAL, INCORPORATED,

*Plaintiff-Appellant, Cross-Appellee,*

*v.*

CHARLENE PRODUCTS, INCORPORATED and PETER YAU,

*Defendants-Appellees, Cross-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 90 C 6933—**Frank H. Easterbrook**, *Circuit Judge.*[1]

_____

ARGUED JUNE 6, 2003—DECIDED JUNE 25, 2004

_____

Before RIPPLE, KANNE and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Pivot Point International, Inc. ("Pivot Point"), brought this cause of action against Charlene Products, Inc., and its president Peter Yau (col-

_____

[1] United States Circuit Judge for the Seventh Circuit, sitting by designation.

lectively "Charlene"), for copyright infringement pursuant to 17 U.S.C. § 501(b). The district court granted summary judgment for the defendants on the ground that the copied subject matter, a mannequin head, was not copyrightable under the Copyright Act of 1976 ("1976 Act"), 17 U.S.C. § 101 et seq. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts

Pivot Point develops and markets educational techniques and tools for the hair design industry. It was founded in 1965 by Leo Passage, an internationally renowned hair designer. One aspect of Pivot Point's business is the design and development of mannequin heads, "slip-ons" (facial forms that slip over a mannequin head) and component hair pieces.

In the mid-1980s, Passage desired to develop a mannequin that would imitate the "hungry look" of high-fashion, runway models. Passage believed that such a mannequin could be marketed as a premium item to cutting-edge hairstylists and to stylists involved in hair design competitions. Passage then worked with a German artist named Horst Heerlein to create an original sculpture of a female human head. Although Passage discussed his vision with Heerlein, Passage did not give Heerlein any specific dimensional requirements. From Passage's description, Heerlein created a sculpture in plaster entitled "Mara."

Wax molds of Mara were made and sent to Pivot Point's manufacturer in Hong Kong. The manufacturer created exact reproductions of Mara in polyvinyl chloride ("PVC"). The manufacturer filled the PVC form with a liquid that expands and hardens into foam. The process of creating the Mara sculpture and of developing the mannequin based on the sculpture took approximately eighteen months.

In February of 1988, when Pivot Point first inspected the PVC forms of Mara, it discovered that the mannequin's hairline had been etched too high on the forehead. The manufacturer corrected the mistake by adding a second, lower hairline. Although the first, higher hairline was visible upon inspection, it was covered with implanted hair. The early PVC reproductions of Mara, and Pivot Point's first shipment of the mannequins in May of 1988, possessed the double hairlines.

About the same time that it received its first shipment of mannequins, Pivot Point obtained a copyright registration for the design of Mara, specifically the bareheaded female human head with no makeup or hair. Heerlein assigned all of his rights in the Mara sculpture to Pivot Point. Pivot Point displayed the copyright notice in the name of Pivot Point on each mannequin.

Pivot Point enjoyed great success with its new mannequin. To respond to customer demand, Pivot Point began marketing the Mara mannequin with different types and lengths of hair, different skin tones and variations in makeup; however, no alterations were made to the facial features of the mannequin. For customer ease in identification, Pivot Point changed the name of the mannequin based on its hair and skin color; for instance, a Mara mannequin implanted with yak hair was called "Sonja," and the Mara mannequin implanted with blonde hair was called "Karin."

At a trade show in 1989, Charlene, a wholesaler of beauty products founded by Mr. Yau,[2] displayed its own "Liza" mannequin, which was very close in appearance to Pivot Point's Mara. In addition to the strikingly similar facial features, Liza also exhibited a double hairline that the early Mara mannequins possessed.

On September 24, 1989, Pivot Point noticed Charlene for copyright infringement. When Charlene refused to stop importing and selling the Liza mannequin, Pivot Point filed this action.[3]

## B.  District Court Proceedings

Pivot Point filed a multi-count complaint in district court against Charlene. It alleged violations of federal copyright law as well as state-law claims; Charlene both answered the complaint and counterclaimed. After extensive discovery, Pivot Point filed a comprehensive motion for summary judgment on its complaint and Charlene's counterclaims. Charlene filed several cross-motions for summary judgment as well. The district court tentatively ruled on these motions in July 2001 and issued a final ruling in October 2001.

### 1.  Merits

In its opinion, the district court stated that "[t]he principal dispute is whether a human mannequin head is copyrightable subject matter. If it is, then there must be a trial on

---

[2]  Mr. Yau was not unfamiliar with Pivot Point. Shortly before founding Charlene Products in 1985, Mr. Yau had worked for Pivot Point.

[3]  Charlene eventually obtained a copyright registration for its Liza mannequin.

the question whether Liza is a knock off of Mara." R.401 at 1. The district court explained that, although sculptural works are copyrightable under 17 U.S.C. § 102(a)(5), sculptures that may be copyrighted are limited by the language of 17 U.S.C. § 101, which provides in relevant part:

> Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

According to the district court, there was no question that Mara was a sculpture. However, in the district court's view, the sculpture served utilitarian ends. "Students in beauty schools practice styling hair on Mara's head and may practice other skills by applying makeup to Mara's eyes, lips, and cheeks. The parties dispute which functions are primary." R.401 at 2.

The district court then explored whether the artistic and utilitarian aspects of Mara were "separable" for purposes of the piece's copyrightability: "The statutory separability requirement confines copyright protection to those aspects of the design that exist apart from its utilitarian value, and that could be removed without reducing the usefulness of the item." Id. at 3. The district court observed that drawing this line is particularly troublesome.

The statute, continued the district court, is generally recognized to suggest two types of separability: physical separability and conceptual separability. The district court

explained that physical separability occurs when the ornamental nature of the object can be physically removed from the object and that

> [c]onceptual separability differs from physical separability by asking not whether the features to be copyrighted could be sliced off for separate display, but whether one can conceive of this process. Relying on a comment in the House Report on the 1976 amendments, the second circuit in *Kieselstein-Cord* [*v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980),] purported to adopt conceptual separability as the exclusive test (632 F.2d at 992, contrasting that approach with *Esquire* [*v. Ringer*, 591 F.2d 796 (D.C. Cir. 1978)], which opted for physical separability, 591 F.2d at 803-04). Why a court should repair to the legislative history is unclear; the second circuit did not identify any ambiguity in § 101 that needed to be resolved, and a statement in the House Report that what appears on the face of the statutory text to be two requirements (physical and conceptual separability) should be administered as just one is not a proposition that in today's legal climate can be indulged. The Supreme Court does not permit the use of legislative history to alter, as opposed to elucidate, a statutory text.

*Id.* at 4.

Despite this lack of statutory moorings, the district court nevertheless reviewed the differing formulations for conceptual separability and determined that the definition proposed by Professor Paul Goldstein was the best one: "a pictorial, graphic or sculptural feature incorporated in the design of a useful article is conceptually separable if it can stand on its own as work of art traditionally conceived, and if the useful article in which it is embodied would be equally useful without it." R.401 at 5 (quoting 1 Paul Goldstein,

*Copyright: Principles, Law & Practice* § 2.5.3, at 109 (1989)). The district court believed that the strength of this definition "comes from the fact that it differs little, if at all, from the test of physical separability embraced by the D.C. Circuit in *Esquire* and by the majority in *Carol Barnhart* [*Inc., v. Economy Cover Corp.*, 773 F.2d 411, 418 (2d Cir. 1985)]." *Id.* Applying this test led the district court to conclude that

> Mara cannot be copyrighted because, even though one can conceive of Mara as a sculpture displayed as art, it would not be *equally* useful if the features that Pivot Point want to copyright were removed. So long as *a* utilitarian function is makeup tutoring and practice and the fact that Pivot Points sells Mara without eye or lip coloring shows that this is *a* function even if not, in Pivot Point's view, the "primary" one—the utilitarian value would be diminished by removing the aesthetic features that Pivot Point wants to protect by copyright.

*Id.*

As a final matter, the district court distinguished two cases, *Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320 (2d Cir. 1996), and *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488 (4th Cir. 1996), which upheld the copyrightability of animal and fish mannequins. The district court found the *Hart* case unpersuasive, but concluded that "one cannot say of Mara what the fourth circuit said of animal mannequins: Mara is valued not for 'its own appearance' but for what it enables students to do and learn. Mara is a 'useful article' as § 101 and *Superior Form Builders* deploy that term." *Id.* at 6.

### 2. Fee Petition

Although fees are available under the 1976 Act, the district court's order made no provision for fees. Charlene,

therefore, sought an award of attorneys' fees of approximately $421,915 pursuant to 17 U.S.C. § 505. Charlene submitted its fees to Pivot Point and sought to confer and exchange information as required by Northern District of Illinois Local Rule 54.3(d). Pivot Point would not participate in this exercise on the basis that any fee request would be untimely because Charlene had missed the fourteen-day deadline for filing a fee motion set forth in Federal Rule of Civil Procedure 54(d)(2)(B).

Charlene then moved for an instruction from the district court ordering Pivot Point to participate in the fee request process but the district court refused. It explained that its "opinion and declaratory judgment resolving this case on the merits did not make any provision for attorneys' fees." R.413 at 1. Because the judgment did not contain an order with respect to an attorneys' fee petition, the district court did not believe Local Rule 54.3 was applicable. Instead, the parties were bound by the fourteen-day deadline set forth in Federal Rule 54 (d)(2)(B). Furthermore, the district court believed that its reading of Local Rule 54.3—as not extending the time period allowed in Federal Rule 54—saved the local rule because otherwise it would be inconsistent with Federal Rule 54 and therefore invalid pursuant to Federal Rule 83.[4]

---

[4]  Federal Rule of Civil Procedure 83 provides:

> (1) Each district court, acting by a majority of its district judges, may, after giving appropriate public notice and an opportunity for comment, make and amend rules governing its practice. *A local rule shall be consistent with—but not duplicative of—Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075*, and shall conform to any uniform numbering system prescribed by the Judicial Conference of
> (continued...)

Finally, the district court acknowledged that it had the discretion to extend the time to file such a motion; however, it stated that it was "not even slightly disposed to grant any [extension], because the parties knew well before October 2 what the judgment was likely to provide." *Id.* at 1.

Pivot Point now appeals from the district court's summary judgment in favor of Charlene; Charlene appeals from the district court's judgment with respect to its attorneys' fee petition.

## II

## ANALYSIS

### A. Standard of Review

This court reviews de novo a district court's grant of summary judgment. *See Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). In evaluating the judgment, we "construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000). If the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary

---

[4] (...continued)

the United States. A local rule takes effect on the date specified by the district court and remains in effect unless amended by the court or abrogated by the judicial council of the circuit. Copies of rules and amendments shall, upon their promulgation, be furnished to the judicial council and the Administrative Office of the United States Courts and be made available to the public.

Fed. R. Civ. P. 83(a)(1) (emphasis added).

judgment is appropriate. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. Copyrightability

The central issue in this case is whether the Mara mannequin is subject to copyright protection. This issue presents, at bottom, a question of statutory interpretation. We therefore begin our analysis with the language of the statute. Two provisions contained in 17 U.S.C. § 101 are at the center of our inquiry. The first of these is the description of pictorial, graphic and sculptural works:

> "Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a *useful article*, as defined in this section, shall be considered a pictorial, graphic, or sculptural work *only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article*.

The definition section further provides that "[a] 'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a 'useful article.'" 17 U.S.C. § 101. As is clear from the definition of pictorial, graphic and sculptural work, only "useful article[s]," as the term is further defined, are subject to the limitation contained in the

emphasized language above. If an article is not "useful" as the term is defined in § 101, then it is a pictorial, graphic and sculptural work entitled to copyright protection (assuming the other requirements of the statute are met).

### 1.  Usefulness

Pivot Point submits that the Mara mannequin is not a "useful article" for purposes of § 101 because its "inherent nature is to portray the appearance of runway models. Its value," continues Pivot Point, "resides in how well it portrays the appearance of runway models, just as the value of a bust—depicting Cleopatra, for example, . . .—would be in how well it approximates what one imagines the subject looked like." Appellant's Br. at 19. Pivot Point relies upon the decisions of the Fourth Circuit in *Superior Form Builders* and of the Second Circuit in *Hart* for the proposition that mannequins, albeit in those cases animal and fish mannequins, are not useful articles. Specifically, the Fourth Circuit explained that

> [a] mannequin provides the creative form and expression of the ultimate animal display. . . . Even though covered with a skin, the mannequin is not invisible but conspicuous in the final display. The angle of the animal's head, the juxtaposition of its body parts, and the shape of the body parts in the final display is little more than the portrayal of the underlying mannequin. Indeed, the mannequin can even portray the intensity of flexed body parts, or it can reveal the grace of relaxed ones. None of these expressive aspects of a mannequin is lost by covering the mannequin with a skin. Thus, any utilitarian aspect of the mannequin exists "merely to portray the appearance" of the animal.

*Superior Form Builders*, 74 F.3d at 494; *see also Hart*, 86 F.3d at 323 ("The function of the fish form is to portray its own

appearance, and that fact is enough to bring it within the scope of the Copyright Act."). Consequently, in Pivot Point's view, because the Mara mannequin performs functions similar to those of animal and fish mannequins, it is not a useful article and is therefore entitled to full copyright protection.

Charlene presents us with a different view. It suggests that, unlike the animal mannequins at issue in *Superior Form Builders* and in *Hart*, the Mara mannequin does have a useful function other than portraying an image of a high-fashion runway model. According to Charlene, Mara also is marketed and used for practicing the art of makeup application. Charlene points to various places in the record that establish that Mara is used for this purpose and is, therefore, a useful article subject to the limiting language of § 101.

Pivot Point strongly disputes that the record establishes such a use and argues that the district court's reliance on Charlene's alleged proof improperly resolves an issue of fact against the non-moving party in contravention of Federal Rule of Civil Procedure 56.[5] Indeed, our own review of the

---

[5] The district court relied heavily on this fact in concluding that Mara is a useful object:

> Mara is a work of "applied art" and displays "artistic craftsmanship"—Pivot Point commissioned a sculptor to design a mannequin head that emulates features of runway models—but serves utilitarian ends: Students in beauty schools practice styling hair on Mara's head and may practice other skills by applying makeup to Mara's eyes, lips, and cheeks. The parties dispute which functions are primary. Charlene Products says that Mara is used primarily for practicing makeup; Pivot Point insists that its primary use is
> (continued...)

record leads us to believe that many of the documents cited by Charlene are susceptible to more than one interpretation.

Nevertheless, we shall assume that the district court correctly ruled that Mara is a useful article and proceed to examine whether, despite that usefulness, it is amenable to copyright protection.

## 2.  Separability

We return to the statutory language. A useful article falls within the definition of pictorial, graphic or sculptural works "*only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of,*

---

[5]  (...continued)

    hair styling. This factual dispute might have legal significance if Pivot Point were contending that Mara's *sole* use is hair styling; then it is (barely) possible to imagine a suitable mannequin head devoid of human features. (The legal significance of this possibility is explicated below.) But Pivot Point contends only that Mara's "primary" use is hair styling; it does not deny that *a* use (if only, in its view, a secondary one) is the application of makeup and other beauty-school arts, and the evidence would not permit a reasonable jury to conclude that Mara has no utilitarian value for makeup practice. (Pivot Point says that it "generally" sells Mara with painted-on makeup, which reveals by negative implication that it also sells Mara without eye or cheek coloring, so that beauty-school students can add their own.)

R.401 at 2.

*the utilitarian aspects of the article.*" 17 U.S.C. § 101.[6] It is common ground between the parties and, indeed, among the courts that have examined the issue, that this language, added by the 1976 Act, was intended to distinguish creative works that enjoy protection from elements of industrial design that do not. *See* H.R. Rep. No. 94-1476, at 55 (1976),

---

[6] Prior to the addition of this language in the 1976 Act, Congress had not explicitly authorized the Copyright Office to register "useful articles." Indeed, when Congress first extended copyright protection to three-dimensional works of art in 1870, copyright protection was limited to objects of fine art; objects of applied art still were not protected. *See* Paul Goldstein, 1 *Copyright* § 2.5.3 at 2:58 (2d ed. 2004). This changed with the adoption of the Copyright Act of 1909 ("1909 Act"); Professor Goldstein explains:

> The 1909 Act, which continued protection for three-dimensional works of art, dropped the requirement that they constitute fine art and thus opened the door to protection of useful works of art. In 1948, the Copyright Office broadened the scope of protection for three-dimensional works of art to cover "works of artistic craftsmanship insofar as their form but not their utilitarian aspects are concerned." The United States Supreme Court upheld this interpretation in *Mazer v. Stein*, [347 U.S. 201, 213 (1954),] holding that the fact that statuettes in issue were intended for use in articles of manufacture—electric lamp bases—did not bar them from copyright. Five years later, in 1959, the Copyright Office promulgated a rule that if "the sole intrinsic function of an article is its utility, the fact that the work is unique and attractively shaped will not qualify it as a work of art." The regulation did, however, permit registration of features of a utilitarian article that "can be identified separately and are capable of existing independently as a work of art."

*Id.* (quoting 37 C.F.R. § 207.8(a) (1949) and 37 C.F.R. § 202.10(c) (1959); footnotes omitted).

*reprinted in* 1976 U.S.C.C.A.N. 5659, 5668 (stating that the purpose behind this language was "to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design"). Although the Congressional goal was evident, application of this language has presented the courts with significant difficulty. Indeed, one scholar has noted: "Of the many fine lines that run through the Copyright Act, none is more troublesome than the line between protectible pictorial, graphic and sculptural works and unprotectible utilitarian elements of industrial design." Paul Goldstein, 1 *Copyright* § 2.5.3, at 2:56 (2d ed. 2004).

The difficulty in the application of this language would not have come, in all likelihood, as a surprise to the Congressional drafters. The language employed by Congress is not the language of a bright-line rule of universal application. Indeed, the circuits that have addressed the interpretative problem now before us uniformly have recognized that the wording of the statute does not supply categorical direction, but rather requires the Copyright Office and the courts "to continue their efforts to distinguish applied art and industrial design." Robert C. Denicola, *Applied Art & Industrial Design: A Suggested Approach to Copyright in Useful Articles*, 67 Minn. L. Rev. 707, 730 (1983). In short, no doubt well-aware of the myriad of factual scenarios to which its policy guidance would have to be applied, Congress wisely chose to provide only general policy guidance to be implemented on a case-by-case basis through the Copyright Office and the courts.

Even though the words of the statute do not yield a definitive answer, we believe that the statutory language nevertheless provides significant guidance in our task. We therefore shall examine in more detail what that language has to tell us, and we return to the necessary starting point of our task, § 101.

The statutory language provides that "the design of a useful article . . . shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features *that can be identified separately from and are capable of existing independently of, the utilitarian* aspects of the article." Although the italicized clause contains two operative phrases—"*can be identified separately from*" and "*are capable of existing independently of*"—we believe, as have the other courts that have grappled with this issue,[7] that Congress, in amending the statute, intended these two phrases to state a single, integrated standard to determine when there is sufficient separateness between the utilitarian and artistic aspects of a work to justify copyright protection.

Certainly, one approach to determine whether material can be "identified separately," and the most obvious, is to rely on the capacity of the artistic material to be severed physically from the industrial design. *See Mazer v. Stein*, 347 U.S. 201 (1954) (holding that a statuette incorporated into the base of a lamp is copyrightable). When a three-dimensional article is the focus of the inquiry, reliance on physical separability can no doubt be a helpful tool in ascertaining whether the artistic material in question can be separated from the industrial design. As Professor Denicola points out, however, such an approach really is not of much use when the item in question is two-dimensional. *See* Denicola, *supra*, at 744. Indeed, because this provision, by its very words, was intended to apply to two-dimensional material, it is clear that a physical separability test cannot be the exclusive test for determining copyrightability.

---

[7]    *See infra* note 8.

It seems to be common ground between the parties and, indeed, among the courts and commentators, that the protection of the copyright statute also can be secured when a conceptual separability exists between the material sought to be copyrighted and the utilitarian design in which that material is incorporated.[8] The difficulty lies not in the

---

[8] Although the district court was skeptical that the statutory language encompassed both physical and conceptual separability, circuits have been almost unanimous in interpreting the language of § 101 to include both types of separability. *See Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 494 (4th Cir. 1996) (asking whether functional aspects of animal mannequins are "conceptually separable from the works' sculptural features"); *Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1144 (2d Cir. 1987) (stating that " '[c]onceptual separability' is alive and well"); *Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 418 (2d Cir. 1985) (judging copyrightability of mannequin torsos based on whether "forms possess aesthetic or artistic features that are physically or conceptually separable from the forms' use as utilitarian objects to display clothes"); *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 923 (11th Cir. 1983) ("Both case law and legislative history indicate that separability encompasses works of art that are either physically severable from the utilitarian article or conceptually severable."); *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993 (2d Cir. 1980) (applying test of conceptual separability).

Only one appellate court has rejected the idea of conceptual separability. *See Esquire, Inc. v. Ringer*, 591 F.2d 796 (D.C. Cir. 1978). In that case, arising under the 1909 Act, the Copyright Office had refused to register a design for outdoor lighting fixtures. The district court, however, believed the fixtures were copyrightable and issued a writ of mandamus that the copyright issue. However, the D.C. Circuit reversed. The precise question

(continued...)

[8] (...continued)

before the court was whether the regulation implementing the 1909 Act mandated that the Copyright Office register a copyright for the lighting fixtures. The regulation at issue provided:

> "(c) If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration."

*Id.* at 800 (quoting 37 C.F.R. § 202.10(b) (1976)). The Copyright Office took the position that the regulation barred "copyright registration for the overall shape or configuration of a utilitarian article, no matter how aesthetically pleasing that shape or configuration may be." *Id.* In determining whether to accept or reject the proffered interpretation, the court noted that "[c]onsiderable weight is to be given to an agency's interpretation of its regulations," especially when "an administrative interpretation relates to a matter within the field of administrative expertise." *Id.* at 801. The court concluded that the Copyright Office had adopted a "reasonable and well-supported interpretation of § 202.10(c)." *Id.* at 800. In the court's view, the interpretation was grounded in "the principle that industrial designs are not eligible for copyright." *Id.* The court also believed that the interpretation found support in the legislative history of the newly enacted 1976 Act. The court acknowledged, however, that the legislative history was not "free from ambiguity"; it explained:

> Esquire could arguably draw some support from the statement that a protectable element of a utilitarian article must be separable "physically *or conceptually*" from the utilitarian aspects of the design. But any possible ambiguity raised by this isolated reference disappears when the excerpt is considered in its entirety. The underscored passages indicate

(continued...)

acceptance of that proposition, which the statutory language clearly contemplates, but in its application. As noted by Pivot Point, the following tests have been suggested for determining when the artistic and utilitarian aspects of useful articles are conceptually separable: 1) the artistic features are "primary" and the utilitarian features "subsidiary," *Kieselstein-Cord*, 632 F.2d at 993; 2) the useful article "would still be marketable to some significant segment of the community simply because of its aesthetic qualities," Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* § 2.08 [B][3], at 2-101 (2004); 3) the article "stimulate[s] in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function," *Carol Barnhart*, 773 F.2d at 422 (Newman, J., dissenting); 4) the artistic design was not significantly influenced by functional considerations, *see Brandir Int'l*, 834 F.2d at

---

[8] (...continued)

unequivocally that the overall design or configuration of a utilitarian object, even if it is determined by aesthetic as well as functional considerations, is not eligible for copyright. Thus the legislative history, taken as congressional understanding of existing law, reinforces the Register's position.

*Id.* at 803-04.

As is evident from the passages set forth above, the issue addressed by the D.C. Circuit in *Esquire* arose in a much different procedural and legal environment than the issue in the present case. The court's focus in *Esquire* was a regulation adopted pursuant to the former law and its obligation to defer to the agency's interpretation of the law embodied in that regulation. Furthermore, the court acknowledged that the 1976 Act was "not applicable to the case before" it. *Id.* at 803. Given these differences, we do not believe that the D.C. Circuit would conclude that its decision in *Esquire* disposed of the issue of conceptual separability presently before this court.

1145 (adopting the test forwarded in Denicola, *supra*, at 741); 5) the artistic features "can stand alone as a work of art traditionally conceived, and . . . the useful article in which it is embodied would be equally useful without it," Goldstein, 1 *Copyright* § 2.5.3, at 2:67; and 6) the artistic features are not utilitarian, *see* William F. Patry, 1 *Copyright Law & Practice* 285 (1994).

Pivot Point submits that "the test for conceptual separability should reflect the focus of copyright law—the artistic, not the marketability, design process, or usefulness." Appellant's Br. at 26. According to Pivot Point, the central inquiry is whether the article is a " 'work of art.' " *Id.* Pivot Point further explains:

> Conceptual separability would inhere in a "work of art" integrated into a useful article, or a "work of art" put to unexpected use, since the independent concepts of art and utility coexist. Conceptual separability would not exist in a useful article rendered simply aesthetically pleasing, since the independent concept of art does not exist, only the "artistic" embellishment to its utility, so that such "artistic" features are actually utilitarian. Should the "artistic" embellishment of utility reach the level of a "work of art," however, conceptual separability may exist.

*Id.* at 26-27. This test, Pivot Point suggests, has the additional benefit of "satisf[ying] most, if not all, of the current definitions of conceptual separability." *Id.* at 27.

Charlene, by contrast, lauds the district court's adoption of Professor Goldstein's test. "Under Goldstein's test," Charlene asserts, " 'a pictorial, graphic or sculptural feature incorporated in the design of a useful article is conceptually separable if it can stand on its own as a work of art traditionally conceived, and if the useful article in which it is

embodied would be *equally* useful without it.' " Appellees' Br. at 26 (quoting R.401 at 5; emphasis added). Charlene contends that this approach mirrors that adopted by the majority in *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir. 1985), "the most closely related precedent to the case at bar." Appellees' Br. at 26.

Although both sides present thoughtful explanations for their proposed tests, we perceive shortcomings in the parties' choices. With respect to Pivot Point's focus on the article as a "work of art," it is certainly correct that Congress, in enacting § 101, attempted to separate the artistic from the utilitarian. However, this approach necessarily involves judges in a qualitative evaluation of artistic endeavors—a function for which judicial office is hardly a qualifier. With respect to the Charlene's approach, we believe that the test, at least when applied alone, is tied too closely to physical separability and, consequently, does not give a sufficiently wide berth to Congress' determination that artistic material conceptually separate from the utilitarian design can satisfy the statutory mandate.

In articulating a meaningful approach to conceptual separability, we note that we are not the first court of appeals to deal with this problem. The work of our colleagues in the other circuits provides significant insights into our understanding of Congressional intent. Indeed, even when those judges have disagreed on the appropriate application of the Congressional mandate to the case before them, their insight yield a bountiful harvest for those of us who now walk the same interpretative path.

Among the circuits, the Court of Appeals for the Second Circuit has had occasion to wrestle most comprehensively with the notion of "conceptual separability." Its case law represents, we believe, an intellectual journey that has ex-

plored the key aspects of the problem. We therefore turn to a study of the key stages of doctrinal development in its case law.

### a.

The Second Circuit first grappled with the issue of conceptual separability in *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980). In that case, Kieselstein-Cord, a jewelry designer, had created a line of decorative and jeweled belt buckles inspired by works of art; he obtained copyright registrations for his designs. When the line was successful, Accessories by Pearl, Inc., ("Pearl") copied the designs and marketed its own, less-expensive versions of the belt buckles. Kieselstein-Cord then sued Pearl for copyright infringement; however, Pearl claimed that the belt buckles were not copyrightable because they were " 'useful articles' with no 'pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects' of the buckles." *Id.* at 991-92. The Second Circuit disagreed. Although it did not articulate a specific test for evaluating conceptual separability, it focused on the "primary" and "subsidiary" elements of the article and concluded:

> We see in appellant's belt buckles conceptually separa-ble sculptural elements, as apparently have the buckles' wearers who have used them as ornamentation for parts of the body other than the waist. The primary ornamen-tal aspect of the Vaquero and Winchester buckles is conceptually separable from their subsidiary utilitarian function. This conclusion is not at variance with the expressed congressional intent to distinguish copyrightable applied art and uncopyrightable indus-

> trial design. Pieces of applied art, these buckles may be considered jewelry, the form of which is subject to copyright protection.

*Id.* at 993 (internal citations omitted).[9]

### b.

The Second Circuit revisited the issue of conceptual separability in *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir. 1985). In that case, Carol Barnhart, a provider of retail display items, developed four mannequins consisting of human torsos for the display of shirts and jackets. It obtained copyright registrations for each of the forms.[10] When a competitor, Economy Cover, copied the designs, Carol Barnhart claimed infringement of that copyright. The Second Circuit held that the designs were not copyrightable. It explained:

> [W]hile copyright protection has increasingly been extended to cover articles having a utilitarian dimension, Congress has explicitly refused copyright protection for works of applied art or industrial design which have aesthetic or artistic features that cannot be identified separately from the useful article. Such works are not copyrightable regardless of the fact that they may be "aesthetically satisfying and valuable."

---

[9]   Judge Weinstein (sitting by designation) dissented. *See Kieselstein-Cord*, 632 F.2d at 993.

[10]   There were a total of four mannequins at issue, two male and two female. Of those four, two of the mannequin forms were unclothed, and two were formed with one layer of clothing and were meant specifically for the display of outerwear.

Applying these principles, we are persuaded that since the aesthetic and artistic features of the Barnhart forms are inseparable from the forms' use as utilitarian articles the forms are not copyrightable. . . . [Barnhart] stresses that the forms have been responded to as sculptural forms, and have been used for purposes other than modeling clothes, e.g., as decorating props and signs without any clothing or accessories. While this may indicate that the forms are "aesthetically satisfying and valuable," it is insufficient to show that the forms possess aesthetic or artistic features that are physically or conceptually separable from the forms' use as utilitarian objects to display clothes. On the contrary, to the extent the forms possess aesthetically pleasing features, even when these features are considered in the aggregate, they cannot be conceptualized as existing independently of their utilitarian function.

*Id.* at 418 (internal citations omitted). The court also rejected the argument that *Kieselstein-Cord* was controlling. The majority explained that what distinguished the Kieselstein-Cord buckles from the Barnhart forms was "that the ornamented surfaces of the buckles were not in any respect required by their functions; the artistic and aesthetic features would thus be conceived as having been added to, or superimposed upon, an otherwise utilitarian article." *Id.* at 419.

Perhaps the most theoretical and comprehensive discussion of "conceptual separability," as opposed to physical separability, can be found in the dissenting opinion of Judge Newman in *Carol Barnhart*, 773 F.2d at 419. After reviewing the possible ways to determine conceptual separability, Judge Newman set forth his choice and rationale:

How, then, is "conceptual separateness" to be determined? In my view, the answer derives from the word "conceptual." For the design features to be "conceptually separate" from the utilitarian aspects of the useful article that embodies the design, the article must stimulate in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function. The test turns on what may reasonably be understood to be occurring in the mind of the beholder or, as some might say, in the "mind's eye" of the beholder. . . .

. . .

The "separateness" of the utilitarian and non-utilitarian concepts engendered by an article's design is itself a perplexing concept. I think the requisite "separateness" exists whenever the design creates in the mind of the ordinary observer two different concepts that are not inevitably entertained simultaneously. Again, the example of the artistically designed chair displayed in a museum may be helpful. The ordinary observer can be expected to apprehend the design of a chair whenever the object is viewed. He may, in addition, entertain the concept of a work of art, but, if this second concept is engendered in the observer's mind simultaneously with the concept of the article's utilitarian function, the requisite "separateness" does not exist. The test is not whether the observer fails to recognize the object as a chair but only whether the concept of the utilitarian function can be displaced in the mind by some other concept. That does not occur, at least for the ordinary observer, when viewing even the most artistically designed chair. It may occur, however, when viewing some other object if the utilitarian function of the object is not perceived at all; it may also occur, even when the utilitarian function is perceived by observation, perhaps

aided by explanation, if the concept of the utilitarian function can be displaced in the observer's mind while he entertains the separate concept of some non-utilitarian function. The separate concept will normally be that of a work of art.

*Id.* at 422-23.

### c.

The Second Circuit soon addressed conceptual separability again in *Brandir International, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2d Cir. 1987). That case involved the work of an artist, David Levine; specifically, Levine had created a sculpture of thick, interwoven wire. A cyclist friend of Levine's realized that the sculpture could, with modification, function as a bicycle rack and thereafter put Levine in touch with Brandir International, Inc. ("Brandir"). The artist and the Brandir engineers then worked to modify the sculpture to produce a workable and marketable bicycle rack. Their work culminated in the "Ribbon Rack," which Brandir began marketing in 1979. Shortly thereafter, Cascade Pacific Lumber Co. ("Cascade") began selling a similar product, and, in response, Brandir applied for copyright protection and began placing copyright notices on its racks. The Copyright Office, however, rejected the registration on the ground that the rack did not contain any element that was "capable of independent existence as a copyrightable pictorial, graphic or sculptural work apart from the shape of the useful article." *Id.* at 1146.

The court first considered the possible tests for conceptual separability in light of its past decisions and, notably, attempted to reconcile its earlier attempts:

Perhaps the differences between the majority and the dissent in *Carol Barnhart* might have been resolved had they had before them the Denicola article on *Applied Art and Industrial Design: A Suggested Approach to Copyright in Useful Articles*, [67 Minn. L. Rev. 707 (1983)]. . . . Denicola argues that "the statutory directive requires a distinction between works of industrial design and works whose origins lie outside the design process, despite the utilitarian environment in which they appear." He views the statutory limitation of copyrightability as "an attempt to identify elements whose form and appearance reflect the unconstrained perspective of the artist," such features not being the product of industrial design. *Id.* at 742. "Copyrightability, therefore, should turn on the relationship between the proffered work and the process of industrial design." *Id.* at 741. He suggests that "the dominant characteristic of industrial design is the influence of nonaesthetic, utilitarian concerns" and hence concludes that copyrightability "ultimately should depend on the extent to which the work reflects artistic expression uninhibited by functional considerations." *Id.* To state the Denicola test in the language of conceptual separability, if design elements reflect a merger of aesthetic and functional considerations, the artistic aspects of a work cannot be said to be conceptually separable from the utilitarian elements. Conversely, where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists.

We believe that Professor Denicola's approach provides the best test for conceptual separability and, accordingly, adopt it here for several reasons. First, the approach is consistent with the holdings of our previous cases. In *Kieselstein-Cord*, for example, the artistic aspects

of the belt buckles reflected purely aesthetic choices, independent of the buckles' function, while in *Carol Barnhart* the distinctive features of the torsos—the accurate anatomical design and the sculpted shirts and collars—showed clearly the influence of functional concerns. . . . Second, the test's emphasis on the influence of utilitarian concerns in the design process may help . . . "alleviate the de facto discrimination against nonrepresentational art that has regrettably accompanied much of the current analysis." *Id.* at 745.

*Id.* at 1145 (footnotes omitted).

Applying Professor Denicola's test to the Ribbon Rack, the court found that the rack was not copyrightable. The court stated that, "[h]ad Brandir merely adopted one of the existing sculptures as a bicycle rack, neither the application to a utilitarian end nor commercialization of that use would have caused the object to forfeit its copyrighted status." *Id.* at 1147. However, when the Ribbon Rack was compared to earlier sculptures, continued the court, it was "in its final form essentially a product of industrial design." *Id.*

In creating the RIBBON Rack, the designer . . . clearly adapted the original aesthetic elements to accommodate and further a utilitarian purpose. These altered design features of the RIBBON Rack, including the spacesaving, open design achieved by widening the upper loops . . ., the straightened vertical elements that allow in- and above-ground installation of the rack, the ability to fit all types of bicycles and mopeds, and the heavy-gauged tubular construction of rustproof galvanized steel, are all features that combine to make for a safe, secure, and maintenance-free system of parking bicycles and mopeds.

. . .

> . . . While the RIBBON Rack may be worthy of admiration for its aesthetic qualities alone, it remains nonetheless the product of industrial design. Form and function are inextricably intertwined in the rack, its ultimate design being as much the result of utilitarian pressures as aesthetic choices . . . . Thus there remains no artistic element of the RIBBON Rack that can be identified as separate and "capable of existing independently, of, the utilitarian aspects of the article."

*Id.* at 1146-47.

**d.**

We believe that the experience of the Second Circuit is also reflected in the more recent encounter of the Fourth Circuit with the same problem. In *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488 (4th Cir. 1996), the court considered whether animal mannequins qualified for copyright protection. The Fourth Circuit first considered whether the mannequins were useful articles as defined by § 101 and concluded that they were not:

> A mannequin provides the creative form and expression of the ultimate animal display. . . . Even though covered with a skin, the mannequin is not invisible but conspicuous in the final display. The angle of the animal's head, the juxtaposition of its body parts, and the shape of the body parts in the final display is little more than the portrayal of the underlying mannequin. . . . None of these expressive aspects of a mannequin is lost by covering the mannequin with a skin. Thus, any utilitarian aspect of the mannequin exists "merely to portray the appearance" of the animal. *See* 17 U.S.C. § 101.

> . . . It is the portrayal of the animal's body expression given by the mannequin that is thus protectable under the Copyright Act. We therefore agree with the district court in this case because "the usefulness of the forms is their portrayal of the appearance of animals." The mannequin forms "by definition are not useful articles."

*Id.* at 494 (quoting *Superior Form Builders v. Dan Chase Taxidermy Supply Co., Inc.*, 851 F.Supp. 222, 223 (E.D. Va. 1994)).

The court, however, also considered whether, if useful, the utilitarian and aesthetic aspects of the mannequin were separable:

> To the extent that an argument can be made that the mannequins in this case perform a utilitarian function—other than portraying themselves—by supporting the mounted skins, we believe the function to be conceptually separable from the works' sculptural features. *See Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1145 (2d Cir. 1987) ("Where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists."); *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 993 (2d Cir. 1980) (finding sculptural element of belt buckle conceptually separable from utilitarian function).

*Id.* Thus, without specifically adopting one of the tests of conceptual separability, the Fourth Circuit determined that artistic work put into the design of the animal frame was copyrightable; the fact that a skin was placed on the model

and that the model, therefore, was useful in the display of the skin did not negate the artistic elements of the design.[11]

---

[11] Notably, in *Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320 (2d Cir. 1996), the Second Circuit shortly thereafter addressed the question whether a fish mannequin was copyrightable. Although the court did not address specifically the issue before us today, its analysis is nevertheless helpful. Referring to its decision in *Carol Barnhart*, the Second Circuit posed the question rather simplistically: "Is taxidermy different [for purposes of copyright protection]?" *Id.* at 321. The Second Circuit resolved that it is:

> We do not agree that *Barnhart* mandates a finding that fish mannequins are "useful articles" undeserving of copyright protection. . . . [W]e do not believe that the *Barnhart* torsos can be analogized to the fish in this case. In *Barnhart*, the headless, armless, backless styrene torsos were little more than glorified coat-racks used to display clothing in stores. The torsos were designed to present the clothing, not their own forms. In taxidermy, by contrast, people look for more than a fish skin; they wish to see a complete "fish." The superficial characteristics of the fish, such as its color and texture, are admittedly conveyed by the skin, but the shape, volume, and movement of the animal are depicted by the underlying mannequin. Whether the fish is shown as resting, jumping, wiggling its tail, or preparing to munch on some plankton, is dictated by the mannequin and by its particular form, not by the skin.

> In short, the fish mannequin is designed to be looked at. That the fish mannequin is meant to be viewed clothed by a fish skin, rather than naked and on its own, makes no difference. The function of the fish form is to portray its own appearance, and that fact is enough to bring it within the scope of the Copyright Act. 17 U.S.C. § 101; *accord Superior Form Builders v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488 (4th Cir. 1996) (distinguishing *Barnhart* and holding that
(continued...)

### e.

There is one final Second Circuit case that bears comment. In *Mattel, Inc. v. Goldberger Doll Manufacturing Co.*, 365 F.3d 133 (2d Cir. 2004), the Second Circuit rejected the idea that a particular expression of features on a doll's face was not subject to copyright protection. The case arose out of the alleged copying of the facial features of Mattel's Barbie dolls by Goldberger Doll Manufacturing when creating its "Rockettes 2000" doll. On Goldberger's motion for summary judgment, the district court held that "copyright protection did not extend to Barbie's eyes, nose, and mouth . . . ." *Id.* at 134. The Second Circuit reversed. Although it did not speak specifically in terms of conceptual separability, the court's reasoning is nevertheless instructive; it stated:

> The proposition that standard or common features are not protected is inconsistent with copyright law. To merit protection from copying, a work need not be particularly novel or unusual. It need only have been "independently created" by the author and possess "some minimal degree of creativity." *Feist Publ'ns, Inc.*

---

[11] (...continued)
mammal taxidermy mannequins are "sculptural works" rather than "useful articles" because their utilitarian aspects serve "merely to portray the appearance" of the animal). . . .

We conclude that fish mannequins even if considered "useful articles," are useful insofar as they "portray the[ir] appearance." 17 U.S.C. § 101. That makes them copyrightable.

*Id.* at 323 (internal citation omitted). Thus, the Second Circuit distinguished fish mannequins from human mannequins; however, it did so on the basis that the fish mannequins were not "useful articles" as that term is defined in § 101, not on the basis that, although useful, the artistic aspects were physically or conceptually separable from the useful aspects of the article.

*v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). . . . There are innumerable ways of making upturned noses, bow lips, and widely spaced eyes. Even if the record had shown that many dolls possess upturned noses, bow lips, and wide-spread eyes, it would not follow that each such doll—assuming it was independently created and not copied from others—would not enjoy protection from copying.

*Id.* at 135 (footnotes and parallel citations omitted). Additionally, the court noted the scope of the copyright protection that the Barbie dolls enjoyed:

The copyright does not protect ideas; it protects only the author's particularized expression of the idea. Thus, Mattel's copyright in a doll visage with an upturned nose, bow lips, and widely spaced eyes will not prevent a competitor from making dolls with upturned noses, bow lips, and widely spaced eyes, even if the competitor has taken the idea from Mattel's example, so long as the competitor has not copied Mattel's particularized expression. An upturned nose, bow lips, and wide eyes are the "idea" of a certain type of doll face. That idea belongs not to Mattel but to the public domain. But Mattel's copyright will protect its own particularized expression of that idea and bar a competitor from copying Mattel's realization of the Barbie features.

*Id.* at 136 (citations omitted).


## C.  Application

Each of these cases differs in the object at issue and the method by which the court evaluated whether the object was entitled to copyright protection. Yet, each court at-

tempted to give effect to "the expressed congressional intent to distinguish copyrightable applied art and uncopyrightable industrial design." *Kieselstein-Cord*, 632 F.2d at 993; *see also Carol Barnhart*, 773 F.2d at 417-18 (reviewing legislative history in detail and concluding that, although "copyright protection has increasingly been extended to cover articles having a utilitarian dimension," Congress did not intend all useful articles that are "aesthetically satisfying or valuable" to be copyrightable); *Brandir Int'l*, 834 F.2d at 1145 (adopting Professor Denicola's test that makes copyrightability dependent upon "the extent to which the work reflects artistic expression uninhibited by functional considerations" (internal quotation marks and citations omitted)); *Superior Form Builders*, 74 F.3d at 494 (distinguishing the animal mannequins at issue from "aesthetically pleasing articles of industrial design").

The Second Circuit cases exhibit a progressive attempt to forge a workable judicial approach capable of giving meaning to the basic Congressional policy decision to distinguish applied art from uncopyrightable industrial art or design. In *Kieselstein-Cord*, the Second Circuit attempted to distinguish artistic expression from industrial design by focusing on the present use of the item, i.e., the "primary ornamental aspect" versus the "subsidiary utilitarian function" of the object at issue. 632 F.2d at 993. In *Carol Barnhart*, the Second Circuit moved closer to a process-oriented approach:

> What distinguishes those [Kieselstein-Cord] buckles from the Barnhart forms is that the ornamented surfaces of the buckles were not in any respect required by their utilitarian functions; the artistic and aesthetic features could thus be conceived of as having been added to, or superimposed upon, an otherwise utilitarian article. The unique artistic design was wholly unnecessary to performance of the utilitarian function. In the case of the

> Barnhart forms, on the other hand, the features claimed to be aesthetic or artistic, e.g., the life-size configuration of the breasts and the width of the shoulders, are inextricably intertwined with the utilitarian feature, the display of clothes. Whereas a model of a human torso, in order to serve its utilitarian function, must have some configuration of the chest and some width of shoulders, a belt buckle can serve its function satisfactorily without any ornamentation of the type that renders the Kieselstein-Cord buckles distinctive.

773 F.2d at 419. Thus, it was the fact that the creator of the torsos was driven by utilitarian concerns, such as how display clothes would fit on the end product, that deprived the human torsos of copyright protection.

This process-oriented approach for conceptual separability—focusing on the process of creating the object to determine whether it is entitled to copyright protection—is more fully articulated in *Brandir* and indeed reconciles the earlier case law pertaining to conceptual separability.

> [T]he approach is consistent with the holdings of our previous cases. In *Kieselstein-Cord*, for example, the artistic aspects of the belt buckles reflected purely aesthetic choices, independent of the buckles' function, while in *Carol Barnhart* the distinctive features of the torsos—the accurate anatomical design and the sculpted shirts and collars—showed clearly the influence of functional concerns. Though the torsos bore artistic features, it was evident the designer incorporated those features to further the usefulness of the torsos as mannequins.

*Brandir*, 834 F.2d at 1145.

Furthermore, *Brandir* is not inconsistent with the more theoretical rendition of Judge Newman in his *Carol Barnhart* dissent—that "the requisite 'separateness' exists whenever the design creates in the mind of an ordinary observer two different concepts that are not inevitably entertained simultaneously." 773 F.2d at 422. When a product has reached its final form as a result of predominantly functional or utilitarian considerations, it necessarily will be more difficult for the observer to entertain simultaneously two different concepts—the artistic object and the utilitarian object. In such circumstances, *Brandir* has the added benefit of providing a more workable judicial methodology by articulating the driving principle behind conceptual separability—the influence of industrial design. When the ultimate form of the object in question is "as much the result of utilitarian pressures as aesthetic choices," "[f]orm and function are inextricably intertwined," and the artistic aspects of the object cannot be separated from its utilitarian aspects for purposes of copyright protection. *Brandir*, 834 F.2d at 1147.

Conceptual separability exists, therefore, when the artistic aspects of an article can be "conceptualized as existing independently of their utilitarian function." *Carol Barnhart*, 773 F.2d at 418. This independence is necessarily informed by "whether the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences." *Brandir*, 834 F.3d at 1145. If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists. Conversely, when the design of a useful article is "as much the result of utilitarian pressures as aesthetic choices," *id.* at 1147, the useful and aesthetic elements are not conceptually separable.

Applying this test to the Mara mannequin, we must conclude that the Mara face is subject to copyright protection. It certainly is not difficult to conceptualize a human face, independent of all of Mara's specific facial features, i.e., the shape of the eye, the upturned nose, the angular cheek and jaw structure, that would serve the utilitarian functions of a hair stand and, if proven, of a makeup model. Indeed, one is not only able to conceive of a different face than that portrayed on the Mara mannequin, but one easily can conceive of another visage that portrays the "hungry look" on a high-fashion runway model. Just as Mattel is entitled to protection for "its own particularized expression" of an "upturned nose[], bow lips, and widely spaced eyes," *Mattel*, 365 F.3d at 136, so too is Heerlein (and, therefore, Pivot Point as assignee of the copyright registration) entitled to have his expression of the "hungry look" protected from copying.

Mara can be conceptualized as existing independent from its use in hair display or make-up training because it is the product of Heerlein's artistic judgment. When Passage approached Heerlein about creating the Mara sculpture, Passage did not provide Heerlein with specific dimensions or measurements; indeed, there is no evidence that Heerlein's artistic judgment was constrained by functional considerations. Passage did not require, for instance, that the sculpture's eyes be a certain width to accommodate standard-sized eyelashes, that the brow be arched at a certain angle to facilitate easy make-up application or that the sculpture as a whole not exceed certain dimensional limits so as to fit within Pivot Point's existing packaging system. Such considerations, had they been present, would weigh against a determination that Mara was purely the product of an artistic effort. By contrast, after Passage met with Heerlein to discuss Passage's idea for a "hungry-look" model, Heerlein had carte blanche to implement that vision

as he saw fit. Consequently, this is not a situation, such as was presented to the Second Circuit in *Carol Barnhart*, in which certain features ("accurate anatomical design and the sculpted shirts and collars") were included in the design for purely functional reasons. *Brandir*, 834 F.2d at 1145. Furthermore, unlike "the headless, armless, backless styrene torsos" which "were little more than glorified coat-racks used to display clothing in stores," *Hart*, 86 F.3d at 323, the creative aspects of the Mara sculpture were meant to be seen and admired. Thus, because Mara was the product of a creative process unfettered by functional concerns, its sculptural features "can be identified separately from, and are capable of existing independently of," its utilitarian aspects. It therefore meets the requirements for conceptual separability and is subject to copyright protection.

## Conclusion

The Mara mannequin is subject to copyright protection. We therefore must reverse the summary judgment in favor of Charlene Products and Mr. Yau; the case is remanded for a trial on Pivot Point's infringement claim. Furthermore, because Charlene Products and Mr. Yau have not prevailed on the merits at this point, the judgment of the district court with respect to attorneys' fees must be vacated. The cross-appeal with respect to attorneys' fees is moot. Pivot Point may recover its costs in this court.

REVERSED AND REMANDED; CROSS-APPEAL DISMISSED

KANNE, *Circuit Judge,* dissenting. Writing for the majority, Judge Ripple has applied his usual thorough and scholarly approach to this difficult intellectual property problem; however, I cannot join the majority opinion because I am not persuaded that the "Mara" mannequin is copyrightable. All functional items have aesthetic qualities. If copyright provided protection for functional items simply because of their aesthetic qualities, Congress's policy choice that gives less protection in patent than copyright would be undermined. *See American Dental Ass'n v. Delta Dental Plans Ass'n,* 126 F.3d 977, 980 (7th Cir. 1997).

The majority rightly assumes that Mara is a "useful article" as defined in 17 U.S.C. § 101. Opinion at 13. To receive copyright protection as a "sculptural work," then, Mara must come within the narrow restrictions placed on "useful articles" in the definition of pictorial, graphic, and sculptural works:

> [T]he design of a useful article . . . shall be considered a . . . sculptural work only if, and only to the extent that, such design incorporates . . . sculptural features that can be identified separately from, *and* are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101 (emphasis added). As the district court noted, the statute requires, on its face, that sculptural features must be separately identified from the utilitarian aspects of the article ("conceptual separability") and they must exist independently from the utilitarian aspects of the article ("physical separability") in order to receive copyright protection. As to whether both conceptual and physical separability are required for copyrightability, most courts and commentators have concluded that only one or the other test is appropriate. But that issue is not presented here because Mara is not copyrightable regardless of whether both or either is applied.

Taking physical separability first, the district court used examples from case law to illustrate that the sculptural features in many useful items can be physically removed from the object and sold separately without affecting the functionality of the useful article. *See, e.g.*, *Mazer v. Stein*, 347 U.S. 201 (1954) (holding that a sculpture of a dancer carved into the base of a lamp may be copyrighted); *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980) (holding that decorative belt buckles could be copyrighted as separate objects sold not to hold up one's pants).

Mara, on the other hand, has only functional attributes. Thus, any physical separation of a portion of her would not be independent of her utilitarian aspects. She is sold to beauty schools as a teaching device; students style her hair and apply makeup as realistic training for such pursuits on live subjects. A mannequin head without a neck, or with different eyes and musculature, would not serve the utilitarian purpose of applying makeup or teaching the art of matching hair styles to facial features. As the district court explained: "Beauty students style hair to flatter the face, not to be worn on featureless ovoids. The use of a mannequin head in training students of beauty schools *lies in its aesthetic qualities*." There is nothing in Mara that we could physically remove that would not be part of Mara's utility as a teaching aid. Like mannequins of human torsos, *Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 418-19 (2d Cir. 1985), mannequins of human faces are not physically separable from their functional purpose and are therefore not copyrightable.

Next, the district court considered various restatements of the meaning of "conceptual separability" (whether features can be identified or conceived of separately from the utilitarian aspects) and applied the most appropriate one to Mara. Professor Goldstein, in his treatise, *Copyright: Princi-*

*ples, Law & Practice*, presents a reasonable explanation of the statutory text: "a . . . sculptural feature incorporated in the design of a useful article is conceptually separable if it can stand on its own as a work of art traditionally conceived, and if the useful article in which it is embodied would be equally useful without it." Mara has no conceptually separable features to which copyright protection could be granted. Her features are incapable of being identified separately from the utilitarian use of those features. Without features, the mannequin's head and neck would be little more than an egg on a stick, useless for its intended purpose. Mara possesses neither physical nor conceptual separability.

The majority, concluding that Congress intended "to state a single, integrated standard," deduced that the standard must be "conceptual separability." This may be correct, as it is very difficult to divine the distinction between physical and conceptual separability if those standards are properly stated. In my view, however, the majority's explanation of conceptual separability lacks a basis in the statute. As the majority sees it, conceptual separability "exists . . . when the artistic aspects of an article can be conceptualized as existing independently of their utilitarian function." Opinion at 36. The majority further explains that the way to determine if this is the case is to look to the process of design: if independent "artistic" choices were made in the sculpture's creation, and such choices were not later sullied by the influence of industrial design, then some of the useful article is a conceptually separable sculpture and therefore copyrightable. Opinion at 36-37.

Problematically, the majority's test for conceptual separability seems to bear little resemblance to the statute. The statute asks two questions: Does the useful article incorporate "sculptural features that can be identified separately

from the utilitarian aspects" of the article? And are these features "capable of existing independently" from the utilitarian aspects? The copyright statute is concerned with protecting only non-utilitarian features of the useful article. To be copyrightable, the statute requires that the useful article's functionality remain intact once the copyrightable material is separated. In other words, Pivot Point needs to show that Mara's face is not a utilitarian "aspect" of the product "Mara," but rather a separate non-utilitarian "feature." The majority, by looking only to whether the features could also "be conceptualized as existing independently of *their utilitarian function*" and ignoring the more important question of whether the features themselves are utilitarian *aspects* of the useful article, mistakenly presupposes that utilitarian aspects of a useful article can be copyrighted. If we took away Mara's facial features, her functionality would be greatly diminished or eliminated, thus proving that her features cannot be copyrighted.

Moreover, the "process-oriented approach," advocated by the majority drifts even further away from the statute. Opinion at 35. The statute looks to the useful article as it exists, not to how it was created. I believe it simply is irrelevant to inquire into the origins of Mara's eyes, cheekbones, and neck. If such features have been fully incorporated as functional aspects of the mannequin, then copyright does not provide protection. Even if we were to look at the "process" that led to the creation of Mara, it is undeniable that, from the beginning, Pivot Point intended Mara to serve a functional purpose and commissioned her creation to fulfill that purpose (not to create a work of art for aesthetic beauty).

The majority, as evidenced by its emphasis on the fact that Charlene Products apparently copied Mara with its doll, "Liza," seems unduly concerned in this context with

Charlene's questionable business practices. This is immaterial to the determination of whether the Mara doll is protected by copyright law. Importantly, other possible legal protections for Pivot Point's intellectual property—design patent, trademark, trade dress, and state unfair competition law—are available to address the majority's concerns. Copyright does not protect functional products. Charlene is free, under its own brand name, to copy and sell copies of useful articles that do not have patent protection. *See, e.g., TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23 (2001); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141 (1989); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225 (1964). I fear that the majority's opinion grants copyright protection to functional aspects of a useful article. I would, therefore, affirm the district court's grant of summary judgment in favor of Charlene Products and Mr. Yau.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*