**Sandra BONAZOLI, dba Beehive Kitchenware, Plaintiff,**

v.

**R.S.V.P. INTERNATIONAL, INC., and the Paragon. Gifts, Inc., Defendants.**

No. C.A.03–0514–S.

United States District Court, D. Rhode Island.

Jan. 18, 2005.

■

Daniel E. Chaika, Esq., Chaika & Chaika, Cranston, RI, Joel D. Joseph, Esq., Bethesda, MD, for Plaintiff.

Elliot A. Salter, Esq., Salter & Michaelson, Providence, RI, John R. Benefiel, Esq., Birmingham, MI, for Defendant.

## DECISION AND ORDER

SMITH, District Judge.

Sandra Bonazoli ("Plaintiff"), owner of Beehive Kitchenware, created a design for measuring spoons in 1998, in which the bowl of each spoon was made in the shape of a heart and the handle in the shape of an arrow shaft. In 2002, R.S.V.P. International, Inc. ("RSVP" or "Defendant"), was shown one of Plaintiff's spoon sets and produced its own version to sell at a lower price.[1] Also in 2002, Plaintiff filed a copyright registration application, which was denied. Plaintiff now brings this action, claiming RSVP violated her copyright and trade dress rights when it copied her spoons.[2] Plaintiff also sues The Paragon Gifts, Inc. ("Paragon"), a marketer of RSVP's spoons. Because Plaintiff has not met her burden of showing that a reasonable trier of fact could rule in her favor on these claims, this Court grants Defendants' Motion for Summary Judgment as to all claims and denies Plaintiff's Motion for Partial Summary Judgment.[3]

1. Plaintiff's measuring spoons sell for $36 to $39, while RSVP's sell for approximately $10.

2. Plaintiff also brings a state unfair competition claim.

## I. Standard of Review

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion for summary judgment is directed against a party that bears the burden of proof, the movant bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is made, the nonmovant then bears the burden of producing definite, competent evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir.1989). In other words, the nonmovant is required to establish that there is sufficient evidence to enable a jury to find in its favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997).

## II. Analysis

### A. Copyrightability

■ "To prevail on a claim of copyright infringement, the plaintiff must show both

3. RSVP's role as manufacturer of the allegedly infringing spoons is primary. Plaintiff's case against Paragon rests on Paragon's sale of the allegedly infringing articles. The claims against Paragon fail as a consequence of Plaintiff's failure to prove the articles Paragon sold are infringing.

ownership of a valid copyright and illicit copying." *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33 (1st Cir.2001). Since this Court concludes Plaintiff has not produced sufficient evidence to survive summary judgment as to the issue of copyrightability, illicit copying need not be addressed.[4]

Copyright law protects original "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). The parties do not dispute that Plaintiff's spoons constitute sculptural works. However, where a sculptural work is a "useful article," 17 U.S.C. § 101 ("A 'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information."), copyright protection exists "only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article," *id.* Measuring spoons are clearly useful articles. Thus, the copyrightability of Plaintiff's spoons turns on the separability, if any, of the spoons' artistic aspects. *See Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 893 (9th Cir.1983) ("[I]f an article has *any* intrinsic utilitarian function, it can be denied copyright protection except to the extent that its artistic features can be identified separately and are capable of existing independently as a work of art.") (emphasis in original).

Courts "have twisted themselves into knots trying to create a test to effectively ascertain whether the artistic aspects of a useful article can be identified separately from and exist independently of the article's utilitarian function." *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 670 (3d Cir.1990). Plaintiff argues that her spoons constitute art embodied in a utilitarian form. She cites *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (finding statuettes constituted art warranting copyright protection even though they were used as bases for lamps), and contends that her application for copyright protection was improperly denied. Defendant argues that the only thing left if one were to separate the spoon from its artistic aspects would be the idea of the heart-arrow, and ideas are not subject to copyright protection. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea...."). Clearly, whatever the artistic aspects of Plaintiff's spoons are, they are not capable of physical separation. *See Esquire, Inc. v. Ringer*, 591 F.2d 796, 804 (D.C.Cir.1978) (pointing out that statuettes in *Mazer* "were undeniably capable of existing as a work of art independent of the utilitarian article into which they were incorporated"). Thus, the issue is the conceptual separability of the utilitarian and artistic forms. *See Pivot Point Int'l, Inc. v. Charlene Prods., Inc.*, 372 F.3d 913, 922 (7th Cir. 2004) ("It seems to be common ground ...

4. In this case, the copyright office has refused to grant Plaintiff a copyright on her spoons and RSVP argues this point to the Court in support of its motion. The degree of deference to be accorded the Copyright Office's determination, however, is unclear. *Compare Norris Indus., Inc. v. Int'l Tele. & Tele. Corp.*, 696 F.2d 918, 922 (11th Cir.1983) (applying abuse of discretion standard), *with Ward v. Nat'l Geographic Soc'y*, 208 F.Supp.2d 429, 444–48 (S.D.N.Y.2002) ("the district court

makes an independent determination"), *and Paul Morelli Design, Inc. v. Tiffany & Co.*, 200 F.Supp.2d 482, 485 (E.D.Pa.2002) ("[T]he Copyright Office's determination in an infringement action is entitled to 'some deference.' "). The question of how much deference is appropriate has not been addressed by the First Circuit. However, since the degree of deference accorded the Copyright Office does not affect this Court's conclusion, the issue need not be resolved here.

among the courts and commentators, that the protection of the copyright statute also can be secured when a conceptual separability exists between the material sought to be copyrighted and the utilitarian design in which that material is incorporated.").

The recent opinion of Judge Ripple in *Pivot Point,* sets forth an extremely helpful survey of the law of conceptual separability. In *Pivot Point,* the issue was whether a mass-produced mannequin head, based upon an original sculpture by the German artist Horst Heerlein and used by hair-stylists in hair design competitions, was a proper subject of copyright protection. *Id.* at 916. After reviewing the statutory interplay of the terms "useful article" and "pictorial, graphic and sculptural works," and assuming for the sake of the opinion that the mannequins were in fact useful articles, the court turned its attention to the issue of separability. *Id.* at 919–20. The court noted that, "[o]f the many fine lines that run through the Copyright Act, none is more troublesome than the line between protectible pictorial, graphic and sculptural works and unprotectible utilitarian elements of industrial design." *Id.* at 921 (quoting Paul Goldstein, 1 Copyright § 2.5.3, at 2:56 (2d ed.2004)). In order to make sense of the varying tests proposed in the case law and secondary sources, the court decided to "study [ ] the key stages of the doctrinal development in [the Second Circuit's] case law," because that circuit "has had occasion to wrestle most comprehensively with the notion of 'conceptual separability,' " and, "[i]ts case law represents ... an intellectual journey that has explored the key aspects of the problem." *Id.* at 924.

Judge Ripple began by looking at *Kieselstein–Cord v. Accessories by Pearl, Inc.,* 632 F.2d 989 (2d Cir.1980), a case described as being "on a razor's edge of

copyright law," *id.* at 990. In *Kieselstein–Cord,* the Second Circuit "focused on the 'primary' and 'subsidiary' elements of the articles"—in that case, decorative and jeweled belt buckles. *Pivot Point,* 372 F.3d at 924. The *Kieselstein–Cord* court held the belt buckles were copyrightable because:

> We see in appellant's belt buckles conceptually separable sculptural elements, as apparently have the buckles' wearers who have used them as ornamentation for parts of the body other than the waist. The primary ornamental aspect of the ... buckles is conceptually separable from their subsidiary utilitarian function.... Pieces of applied art, these buckles may be considered jewelry, the form of which is subject to copyright protection.

632 F.2d at 993.

The next Second Circuit case the *Pivot Point* court examined was *Carol Barnhart, Inc. v. Economy Cover Corp.,* 773 F.2d 411 (2d Cir.1985). In *Barnhart,* the Second Circuit addressed the question whether "four mannequins consisting of human torsos for the display of shirts and jackets" were copyrightable, and concluded they were not. *Pivot Point,* 372 F.3d at 925. The *Barnhart* court pointed out that:

> [W]hile copyright protection has increasingly been extended to cover articles having a utilitarian dimension, Congress has explicitly refused copyright protection for works of applied art or industrial design which have aesthetic or artistic features that cannot be identified separately from the useful article. Such works are not copyrightable regardless of the fact that they may be "aesthetically satisfying and valuable."

773 F.2d at 418. Applying this limitation on copyrightability to the mannequins before it, the Second Circuit concluded that "since the aesthetic and artistic features of the Barnhart forms are inseparable from

the forms' use as utilitarian articles the forms are not copyrightable." *Id.* This was so, even though the mannequins "have been responded to as sculptural forms, and have been used for purposes other than modeling clothes, e.g., as decorating props and signs without any clothing or accessories," because, "[w]hile this may indicate that the forms are 'aesthetically satisfying and valuable,' it is insufficient to show that the forms possess aesthetic or artistic features that are physically or conceptually separable from the forms' use as utilitarian objects to display clothes." *Id.* The *Barnhart* court distinguished *Kieselstein–Cord* on the ground that "the ornamental surfaces of the buckles were not in any respect required by their utilitarian functions; the artistic and aesthetic features could thus be conceived of as having been added to, or superimposed upon, an otherwise utilitarian article." *Id.* at 419.

Judge Ripple went on to note, in *Pivot Point*, that "[p]erhaps the most theoretical and comprehensive discussion of 'conceptual separability,' as opposed to physical separability, can be found in the dissenting opinion of Judge Newman in [*Barnhart*]." *Pivot Point*, 372 F.3d at 925. In that dissent, Judge Newman espoused a test for conceptual separability that turns on "whether the concept of the utilitarian function can be displaced in the mind by some other concept." *Barnhart*, 773 F.2d at 422 (Newman, J., dissenting). In other words, "the article must stimulate in the mind of the beholder a concept that is separate from the concept evoked by its utilitarian function." *Id.* By way of negative example, such conceptual separability "does not occur, at least for the ordinary observer, when viewing even the most artistically designed chair," because "[t]he ordinary observer can be expected to apprehend the design of a chair whenever the object is viewed." *Id.*

Following this explication of Judge Newman's dissent in *Barnhart*, the court in *Pivot Point* went on to examine the Second Circuit's opinion in *Brandir Int'l, Inc. v. Cascade Pacific Lumber Co.*, 834 F.2d 1142 (2d Cir.1987). *Brandir* involved the copyrightability of a bicycle rack (the "RIBBON Rack") based upon a sculpture by the artist David Levine. The court in that case adopted the test of conceptual separability set forth by Professor Robert C. Denicola, in his article *Applied Art and Industrial Design: A Suggested Approach to Copyright in Useful Articles*, 67 Minn. L.Rev. 707 (1983). In that article, Professor Denicola stated that copyrightability "should turn on the relationship between the proffered work and the process of industrial design. Because the dominant characteristic of industrial design is the influence of nonaesthetic, utilitarian concerns, copyrightability ultimately should depend on the extent to which the work reflects artistic expression uninhibited by functional considerations." *Id.* at 741. The *Brandir* court restated this test to say: "[I]f design elements reflect a merger of aesthetic and functional considerations, the artistic aspects of a work cannot be said to be conceptually separable from the utilitarian elements. Conversely, where design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences, conceptual separability exists." 834 F.2d at 1145. The *Brandir* court concluded that this approach "is consistent with the holdings of our previous cases. In [*Kieselstein–Cord*], for example, the artistic aspects of the belt buckles reflected purely aesthetic choices, independent of the buckles' function, while in [*Barnhart*] the distinctive features of the torsos ... showed clearly the influence of functional concerns." *Brandir*, 834 F.2d at 1145. In applying this test to the bicycle rack before it, the *Brandir* court held that the

rack was not copyrightable. The court pointed specifically to the fact that:

> In creating the RIBBON Rack, the designer has clearly adapted the original aesthetic elements to accommodate and further a utilitarian purpose. These altered design features of the RIBBON Rack, including the spacesaving, open design achieved by widening the upper loops to permit parking under as well as over the rack's curves, the straightened vertical elements that allow in—and above-ground installation of the rack, the ability to fit all types of bicycles and mopeds, and the heavy-gauged tubular construction of rustproof galvanized steel, are all features that combine to make for a safe, secure, and maintenance-free system of parking bicycles and mopeds.

834 F.2d at 1147. Therefore, "[w]hile the RIBBON Rack may be worthy of admiration for its aesthetic qualities alone, it remains nonetheless the product of industrial design. Form and function are inextricably intertwined in the rack, its ultimate design being as much the result of utilitarian pressures as aesthetic choices." *Id.* "Thus there remains no artistic element of the RIBBON Rack that can be identified as separate and 'capable of existing independently, of, the utilitarian aspects of the article.'" *Id.* at 1147–48.

The *Pivot Point* court finished its analysis by concluding:

> Conceptual separability exists, therefore, when the artistic aspects of an article can be "conceptualized as existing independently of their utilitarian function." *Carol Barnhart,* 773 F.2d at 418. This independence is necessarily in-

formed by "whether the design elements can be identified as reflecting the designer's artistic judgment exercised independently of functional influences." *Brandir,* 834 F.2d at 1145.

*Pivot Point,* 372 F.3d at 931. The *Pivot Point* court found that such a process-oriented approach, as set out in *Brandir,* was consistent with the evolution of the law in the Second Circuit. *Pivot Point,* 372 F.3d at 930–31 ("The Second Circuit cases exhibit a progressive attempt to forge a workable judicial approach capable of giving meaning to the basic Congressional policy decision to distinguish applied art from uncopyrightable industrial art or design.... Th[e] process-oriented approach for conceptual separability ... reconciles the earlier case law ... [and] is not inconsistent with the more theoretical rendition of Judge Newman in his *Carol Barnhart* dissent...."). The *Pivot Point* court then applied this test to the mannequin head at issue in the case before it and concluded it was entitled to copyright protection because:

> [T]here is no evidence that Heerlein's artistic judgment was constrained by functional considerations. Passage did not require, for instance, that the sculpture's eyes be a certain width to accommodate standard-sized eyelashes, that the brow be arched at a certain angle to facilitate easy make-up application or that the sculpture as a whole not exceed certain dimensional limits so as to fit within Pivot Point's existing packaging system.

*Id.* at 931–32.[5]

In a realm where the analysis often sounds more like metaphysics than law,

---

5. The *Pivot Point* court also based its conclusion upon the fact that "[i]t certainly is not difficult to conceptualize a human face, independent of all of [the mannequin head]'s specific facial features." 372 F.3d at 931.

Plaintiff might be inclined to latch on to this language to argue that it would also not be difficult to conceptualize measuring spoons independent of Plaintiff's heart shape, and thus this Court should find conceptual separa-

*Pivot Point* lays out a refreshingly clear approach. As applied to this case, the process-oriented approach leaves Plaintiff's claim of copyrightability wanting. For example, unlike the mannequin head in *Pivot Point,* the size of the scoop of each measuring spoon is dictated by function (the standard sizes of tablespoon, teaspoon, and so forth) and not by artistic interests; the handle (made to look like the feathers at the end of an arrow) are designed to be a grip; and while the material (pewter) arguably serves an aesthetic purpose as opposed to steel, it too serves function by virtue of its strength and durability (a gold shovel is still a shovel, regardless of the material of which it is made). Put another way, like the bicycle rack in *Brandir,* the heart shape arrow design in this case (which certainly is not original to the Plaintiff) was clearly adapted to be a set of measuring spoons. Everything about their size and shape is designed to measure material accurately and to scoop effectively.

Of course, *Pivot Point* is a very recent case and it is by no means clear that the First Circuit would adopt its analysis.

But this Court need not worry whether the Seventh Circuit's test for conceptual separability would be palatable to the First Circuit because Plaintiff's claim of copyrightability also fails under every other test set forth in this decision. To begin with, applying the *Kieselstein–Cord* primary/subsidiary test, it is readily apparent that whatever artistic elements comprise Plaintiff's spoons, they are not primary. Rather, it is the utilitarian function of measuring spoons that is primary. While Plaintiff has presented evidence to the effect that her spoons have ornamental aspects in addition to their utilitarian function, she has presented no evidence to rebut the fairly obvious conclusion that the spoons are designed to serve primarily a functional purpose.[6] Furthermore, as has already been discussed, even though the ornamental features of the spoons may "not in any respect [be] required by their utilitarian functions," *Barnhart,* 773 F.2d at 419, they have been "adapted ... to accommodate and further a utilitarian purpose," *Brandir,* 834 F.2d at 1147. Thus there remains no artistic element of

bility. Such an argument would miss the point, however, that the test the *Pivot Point* court proposed was not "inconsistent with the more theoretical rendition of Judge Newman in his *Carol Barnhart* dissent." *Pivot Point,* 372 F.3d at 931. As explained below, because an ordinary observer would never view Plaintiff's spoons without apprehending the design of a measuring spoon, any result other than the one this Court reaches would be inconsistent with Judge Newman's *Barnhart* dissent, and thus inconsistent with the test of conceptual separability espoused by Judge Ripple in *Pivot Point.* The consistency of this conclusion with the holding of *Pivot Point* is further demonstrated by the alleged utilitarian functions of the mannequin head in that case, which was to serve as a hair stand and makeup model. *See id.* An ordinary observer could view the mannequin head in *Pivot Point* without apprehending either of those useful items. *Cf. id.* at 920 (assuming that the mannequin head was a useful item so as to

allow the court to resolve the issue of copyrightability on the basis of separability).

6. Plaintiff's own submission of various ads and magazine articles describing the spoons supports this conclusion. (*See* Pl.'s Reply Ex. 2 ("Beehive describes its wares as 'utensils that integrate ornament and playfulness with utility.' As with any well-crafted baking tool, they are sturdy and designed to last, yet when not in use, they could serve as a part of your kitchen decor."); Ex. 6 ("Bonazoli recognizes that kitchenware serves a humble purpose, but from the start she wanted the designs to be charming as well as functional."); Ex. 8 ("For a gift that's utilitarian yet fun, try Beehive Kitchenware's four heart-shaped measuring spoons."); Ex. 9 ("Heart-shaped measuring spoons.... Like your tried-and-true recipes, they're meant to be used often and handed down for generations.").)

Plaintiff's spoons "that can be identified as separate and 'capable of existing independently, of, the utilitarian aspects of the article.'" *Id.* at 1148. Finally, comparing Plaintiff's spoon to the artistically designed (yet non-copyrightable) chair of Judge Newman's *Barnhart* dissent, one must conclude that, regardless of how aesthetically pleasing Plaintiff's spoons may be, "[t]he ordinary observer can be expected to apprehend the design of a [measuring spoon] whenever the object is viewed." *Barnhart,* 773 F.2d at 422 (Newman, J., dissenting).

This conclusion is not to be read as being dismissive of the artistic aspects of Plaintiff's measuring spoons, or the effort she and her husband put into creating them. To the contrary, the magazine articles Plaintiff has submitted to this Court clearly convey that she is a designer who has achieved (and continues to achieve) her goal of adding to people's joy in preparing food. · Both Plaintiff and her husband are fully justified in taking great pride in their creations. However, Plaintiff's effort and purpose in designing these spoons is not enough to bestow upon her a right to sue Defendant for producing and selling similar items. In the admittedly grey area of copyright law that covers items of industrial design, no reasonable trier of fact could conclude that the artistic aspects of Plaintiff's spoons are separable from their functional aspects. *See* United States Copyright Office, *Compendium of Copyright Practices,* § 505.05 (1984) ("In applying the test of separability, the following are not relevant considerations: 1) the aesthetic value of the design, 2) the fact that the shape could be designed differently, or 3) the amount of work which went into the making of the design. Thus, the mere fact that a famous designer produces a uniquely shaped food processor does not render the design of the food processor copyright-

able."). Plaintiff's copyright infringement claim must fail.

### B. *The Trade Dress Claim*

■ In order for Plaintiff to prevail on her trade dress claim she must prove both the existence of a protectible mark and infringement of that mark.

#### 1. *Existence of Protectible Mark*

■ Trade dress is "the overall appearance ... of a product." Black's Law Dictionary 1530 (8th Ed.2004). "If a trade dress is distinctive and nonfunctional, it may be protected under trademark law." *Id.* Ultimately, the key issue is whether the alleged mark is "an indicator of origin," *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 40 (1st Cir.1998) (quoting 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 8:13 (4th ed.1996)), as opposed to simply "an important factor in the appeal of the product," Restatement (Third) of Unfair Competition § 17 cmt. C, illus. 8 (1995).

##### a. *Functionality*

■ "To be protected under the Lanham Act, ... trade dress must not be functional." *I.P. Lund,* 163 F.3d at 36. "The core inquiry into whether trade dress is functional requires examination of the effects ·that granting protection to a product will have on the ability of others to compete." *Id.* at 37.

■ The burden is on Plaintiff to prove non-functionality, and the presumption is that the item is functional. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 30, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). Furthermore, aesthetic features may be deemed functional. *See Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 170, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (noting that the "noble instinct for giving the right touch of beauty to

common and necessary things" constitutes a nontrademark function) (quoting G. Chesterton, Simplicity and Tolstoy 61 (1912)); *see also* Restatement (Third) of Unfair Competition § 17 cmt. c, illus. 8 (1995) ("['A'] is the first seller to market candy intended for Valentine's Day in heart-shaped boxes. Evidence establishes that the shape of the box is an important factor in the appeal of the product to a significant number of consumers. Because there are no alternative designs capable of satisfying the aesthetic desires of these prospective purchasers, the design of the box is functional...."). Defendant has submitted evidence that the heart-shape design of Plaintiff's measuring spoons is functional in the sense that its appeal produces demand. (*See* Decl. of Philip Campbell at 2–3 ("Sometime in 2002, I was approached by a customer of RSVP and shown a measuring spoon set which the customer thought was an attractive product but too expensive and impractical for a houseware product, and asked if RSVP could offer the customer a cheaper more practical version of the same.... Thinking there would be a consumer demand for the arrow-heart shape measuring spoons, I further refined the design by lengthening the handles and ordered additional quantities to be offered by RSVP to all of its customers. Another company also thereafter began selling the same measuring spoons as [were] being sold by Defendant RSVP, apparently obtained from the same source as RSVP.").) Plaintiff, meanwhile (as will be explained in more detail below), has not produced sufficient evidence for a reasonable trier of fact to conclude that her product design serves the primary non-functional purpose of identifying her as the source of the product. Accordingly, the Court finds that there is no factual dispute as to the aesthetic functionality of Plaintiff's measuring spoons, and that to grant her trade dress protection would "interfere with legitimate (nontrademark related) competition through actual or potential exclusive use of an important product ingredient," *Qualitex,* 514 U.S. at 170, 115 S.Ct. 1300. Therefore, summary judgment on Plaintiff's trade dress claim is appropriate in favor of Defendant on that ground. *See Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,* 916 F.2d 76, 77, 81 (2d Cir.1990) (abrogation on other grounds recognized by *Ashley Furniture Indus., Inc. v. SanGiacomo N.A.,* 187 F.3d 363 (4th Cir.1999)) (holding that trade dress protection was not available for silverware bearing pattern described as "ornate, massive and flowery [with] indented, flowery roots and scrolls and curls along the side of the shaft, and flower arrangements along the front of the shaft," because "where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection").

b. *Distinctiveness*

 The distinctiveness prerequisite for receiving trademark protection can be met either by demonstrating inherent distinctiveness or secondary meaning. *I.P. Lund,* 163 F.3d at 39. "The inquiry into distinctiveness turns on the total appearance of the product, not on individual elements." *Id.* Defendant argues that Plaintiff's mark constitutes "product design," as opposed to "product packaging." The Supreme Court's decision in *Wal–Mart Stores, Inc. v. Samara Bros.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), clarified that "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Id.* at 216, 120 S.Ct. 1339. Plaintiff rightly does not challenge the conclusion that the heart-shaped aspect of her measuring

spoons constitute product design, thus she can only sustain an action for trade dress infringement if the product design has acquired secondary meaning.

"[S]econdary meaning in a product configuration case will generally not be easy to establish." *Duraco Prods., Inc. v. Joy Plastic Enters.*, 40 F.3d 1431, 1453 (3d Cir.1994). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The First Circuit has stated that "[w]hile some have suggested that the primary significance test is too stringent, particularly for product design cases, we reject any lesser test." *I.P. Lund*, 163 F.3d at 42.

"Proof of secondary meaning entails vigorous evidentiary requirements," *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir.1993), and "requires at least *some* evidence that consumers associate the trade dress with the source," *Yankee Candle*, 259 F.3d at 44 (emphasis in original). "Secondary meaning may be 'established in a number of ways,' and courts may weigh a number of factors...." *I.P. Lund*, 163 F.3d at 42 (internal cite omitted).

[While t]he only direct evidence probative of secondary meaning is consumer surveys and testimony by individual consumers[, s]econdary meaning may also be proven through circumstantial evidence, specifically the length and manner of the use of the trade dress, the nature and extent of advertising and promotion of the trade dress, and the efforts made to promote a conscious connection by the public between the trade dress and the product's source. *Yankee Candle*, 259 F.3d at 43.

No reasonable jury could find any secondary meaning here. First, Plaintiff's spoons are functional, and "there is a relationship between functionality and secondary meaning," because a claim of secondary meaning is made on the basis of "something in the design which is not functional serv[ing] primarily to signify the source of the [product] and not primarily to signify that it is an aesthetically pleasing [product]." *I.P. Lund*, 163 F.3d at 42; *see also Wal–Mart*, 529 U.S. at 213, 120 S.Ct. 1339 ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing."). To paraphrase the First Circuit in *Yankee Candle*, given the functional nature of Plaintiff's claimed trade dress, "the concern that protection could prevent healthy competition ... weighs heavily in this case." 259 F.3d at 45. Second, while there is evidence of an attempt to copy Plaintiff's design, and proof of intentional copying may be probative of secondary meaning, "attempts to copy ... will quite often *not* be probative [because] the copier may very well be exploiting a particularly desirable feature, rather than ... confus[ing] consumers as to the source of the product." *Duraco Prods.*, 40 F.3d at 1453 (emphasis added); *see also Yankee Candle*, 259 F.3d at 45 ("the relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another"). Furthermore, as to copying, Defendant has produced a laundry list of ways in which Defendant's spoons are different from Plaintiff's. (*See* Def.'s Opp. at 8 ("Plaintiff's spoons are made of cast pewter ... while Defendant's are of highly polished stainless steel[;]

Plaintiff's spoons have substantially shorter handles than Defendant's[;] Plaintiff's bowls have heavy walls creating a prominently visible rim ... Defendant's spoons are substantially thinner[;][t]he fletching lines on Defendant's spoons are much fewer and stamped in to be visible on both sides of the handle.").) This, too, weighs against a finding of secondary meaning. *See I.P. Lund,* 163 F.3d at 42 (noting that items "were mostly dissimilar" in finding no secondary meaning). Third, Defendant has produced unrebutted evidence that it has consistently identified its spoons with its own trademark. "The inference of unfair competition will be even weaker where the copier takes conspicuous steps ... to distinguish its product from its competitor's." *Duraco Prods.,* 40 F.3d at 1453. Finally, Defendant has produced evidence of a number of different companies selling Plaintiff's spoons without reference to the source, and this also cuts against secondary meaning.[7] *Id.*

Plaintiff had an opportunity to protect her measuring spoons via copyright or patent. *See I.P. Lund,* 163 F.3d at 51 (Boudin, J., concurring) ("Ordinarily the creator of something new—a useful device, a pharmaceutical drug, an ornament, a painting—owns any such object that he or she makes but can prevent its replication by others only pursuant to the patent and copyright laws."); *see also id.* at 32 ("Al-

though [Plaintiff] may have been able to obtain a design patent and so protect its [design] in that way, at least for a period of fourteen years, it chose not to. Rather, it chose to turn for protection to legal doctrines of trademark and trade dress, originally crafted without product designs in mind.") (internal citation omitted). Plaintiff's attempt to secure copyright protection failed, and, apparently, Plaintiff chose not to pursue the possible protections of a design patent. Both these types of protection are purposefully time-limited. *Id.* at 51 ("A central limitation on patent and copyright protection, stemming from the Constitution itself, is that it is limited in time."). It seems to this Court that Plaintiff seeks a perpetual monopoly via trademark protection far in excess of what she could obtain via the trademark application process. This is not a result that the evidence can support. *Cf. id.* at 53 ("[T]he threat to the public interest, ordinarily countered by the time limit on patent protection, is acute where a permanent protection is offered not to a word or symbol but to the design of an article of manufacture."). "[J]ust as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995). Here, Defendant's spoons embody the generalized idea of a

---

7. While Plaintiff has produced no customer survey evidence, she did submit an affidavit following the hearing on this motion, referencing four "craft show buyers [who] saw the RSVP spoons and were either confused about their origin, or stated to plaintiff that she had been 'knocked off.'" (Pl.'s Suppl. Mem. at 2.) Putting aside the issue of whether this Court should take cognizance of this posthearing filing, which not only presents facts not previously submitted but bases at least part of its allegations on further affidavits Plaintiff is "in the process of preparing" (*id.*), this submission is insufficient to alter the

Court's conclusion. A showing that some people have come to associate the heart-shaped spoons with Plaintiff's company does constitute some evidence of secondary meaning. However, in light of all the evidence set out in the body of this opinion, Plaintiff has not produced enough evidence to allow any reasonable jury to conclude that "in the minds of the public, the *primary* significance of a product feature ... is to identify the source of the product." *Inwood Labs.,* 456 U.S. at 851 n. 11, 102 S.Ct. 2182 (emphasis added).

cupid's-arrow measuring spoon and so are not subject to trademark protection. *See id.* at 33 ("Just as the first company to depict a heart and an arrow on Valentine's cards . . . could not seek protection for those designs because they are concepts, defined abstractly, so Paper House cannot obtain protection for its general idea of creating cards out of die-cut photographs.").

### 2. *Infringement of Protectible Mark*

Because the Court concludes Plaintiff does not have a protectible mark, the question whether that mark was infringed does not arise.

### C. *The State Unfair Competition Claim*

■ Plaintiff makes a claim for unfair competition under Rhode Island law. (Pl.'s Opp. at 8.) Defendant argues that this Court does not have jurisdiction to hear the state law unfair competition claim after the two federal counts are dismissed because there is no diversity in this case. This is not correct. *See Tenn. v. 777 N. White Station Rd.,* 937 F.Supp. 1296, 1304 (W.D.Tenn.1996) ("While the elimination of all federal claims gives the district court 'a powerful reason to choose not to continue to exercise [supplemental jurisdiction over the remaining state law claims],' the district court's decision to retain, dismiss, or remand the remaining supplemental claims is discretionary.") (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Because the resolution of the state law unfair competition claim is straightforward, the Court chooses to resolve it here.

■ The Supreme Court of Rhode Island "has undertaken a similar analysis as the Restatement in unfair competition cases. Unfair competition occurs when 'the device . . . would be likely to confuse and mislead the public generally to purchase the product . . . of one person when the actual intention was to purchase the product . . . of another.'" *Nat'l Lumber & Bldg. Materials Co. v. Langevin,* 798 A.2d 429, 433 (R.I.2002) (quoting *Merlino v. Schmetz,* 66 R.I. 425, 20 A.2d 266, 267 (1941)). "The Court has also approved of the concept of 'secondary meaning' with regard to unfair competition cases." *Id.* However, functional items are excluded from the purview of state unfair competition law. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 158, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) ("[T]he common-law tort of unfair competition has been limited to protection against copying of nonfunctional aspects of consumer products which have acquired secondary meaning such that they operate as a designation of source."). Thus, in light of the Court's conclusions above, Plaintiff's state law claim fails. *See Interactive Network, Inc. v. NTN Communications, Inc.,* 875 F.Supp. 1398, 1410 (N.D.Cal.1995) ("To the extent that NTN's claims depend on those elements of [its computer game] that the court found are uncopyrightable expression or functional 'trade dress,' the court finds that the state law [unfair competition] claims have no merit.").

### III. *Conclusion*

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Plaintiff's Motion for Partial Summary Judgment is DENIED; and

2. Defendants' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.